**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| BETH DENUTO, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FRONTLINE TECHNOLOGIES GROUP, LLC,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Beth Denuto ("Plaintiff"), on behalf of Plaintiff and a proposed class of similarly situated individuals, files this Class Action Complaint against Frontline Technologies Group, LLC ("Frontline" or "Defendant"). Except for those allegations concerning Plaintiff personally, which are based on Plaintiff's own knowledge, the following allegations are made on information and belief and on the investigation conducted by Plaintiff's counsel.

## NATURE OF THE ACTION

1. This is a class action brought by Plaintiff and the proposed Class on behalf of every individual who supplied Defendant with sensitive Personally Identifiable Information ("PII" or "Private Information") that was later compromised in a cybersecurity incident (the "Data Breach" or "Breach").

2. The claims asserted here arise from Defendant's failure to secure the Private Information placed in its care, together with its related obligation to safeguard that information while storing and transmitting it.

3. Defendant supplies educational-administration software to more than 4,000 school districts and over 1,000,000 teachers.

4. During the first week of October 2026, Defendant began mailing notice letters (the "Notice") to the individuals affected. The Notice advised that, "[o]n August 14, 2026, our security team identified a vulnerability in a third-party software product we use that allowed unauthorized access to a portion of the environment," and that Defendant thereafter opened an investigation into what had happened.

5. On information and belief, the Breach reached the Private Information of students and employees at the affected school districts, exposing data that included Social Security numbers, email addresses, and home addresses.

6. Having solicited, collected, used, and profited from this Private Information, Defendant owed Plaintiff and the Class a duty to adopt every reasonable and necessary safeguard to keep that information secure against unauthorized access. Defendant disregarded that duty by failing to put adequate security practices in place or to maintain them.

7. Although Defendant concedes that unauthorized parties reached information stored on its systems, it has disclosed little about how the Breach happened.

8. Defendant did not take the precautions required to keep individuals' Private Information safe.

9. Whatever Defendant has done to downplay the Breach, it cannot and does not dispute that the sensitive Private Information of Plaintiff and the Class was accessed without authorization.

10. The people affected by the Breach remain exposed to the danger that their data will be trafficked or posted on the dark web and eventually put to unlawful use.

11. Because of the sensitivity of the exposed data, Plaintiff and the Class have suffered irreparable harm: they have lost control over their Private Information and now face a heightened risk of identity theft.

12. Defendant had both the resources and the staff needed to stop the Breach, yet it declined to deploy security measures reasonable for the sensitive, unencrypted information it held, and that failure led directly to the exposure of the Private Information of Plaintiff and the Class.

13. Defendant's deficient data security and notification practices left the Private Information of Plaintiff and the Class open to criminals. As a result, Plaintiff and the Class have sustained, and will continue to sustain, harm—including monetary losses from the misuse of their Private Information, the lost or reduced value of that information, time expended detecting and guarding against identity theft, and the theft of their personal and financial data.

14. Plaintiff files this action on behalf of everyone whose Private Information was exposed because Defendant failed to (i) adequately protect the Private Information of Plaintiff and the Class; (ii) alert Plaintiff and the Class to its deficient information-security practices; and (iii) secure the systems holding that protected Private Information through reasonable measures free of known vulnerabilities. That conduct constitutes, at a minimum, negligence and violates federal and state law.

15. Plaintiff asserts these claims individually and for a Nationwide Class, pleading causes of action for negligence, negligence *per se*, unjust enrichment, and breach of implied contract.

16. Through this action, Plaintiff seeks redress for the resulting harm and an end to the continuing exposure—for Plaintiff and for every similarly situated person whose data was taken in the Breach and who remains at risk because of Defendant's deficient security.

## THE PARTIES

17. Plaintiff Beth Denuto resides in, and is a citizen of, Fredon, New Jersey in Sussex County, and intends to remain there.

18. Defendant is a Pennsylvania corporation headquartered at 550 E. Swedesford Road, Suite 360, Wayne, Pennsylvania 19087.

## JURISDICTION AND VENUE

19. The Court has subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2): the amount in controversy exceeds $5 million exclusive of interest and costs, at least one Class Member is diverse from Defendant, and the putative Class exceeds 100 members.

20. The Court has general personal jurisdiction over Defendant, which is headquartered and maintains its principal place of business in Pennsylvania.

21. Venue lies in this District under 28 U.S.C. § 1391 because Defendant's principal place of business sits here and because a substantial portion of the events, acts, and omissions underlying Plaintiff's claims occurred here.

## FACTUAL BACKGROUND

### A. Defendant's Business

22. Defendant develops and provides administration and workforce-management software and services for use by school districts.

23. On information and belief, Defendant represented to the individuals from whom it collected Private Information—Plaintiff and the Class—that their information would be held safely and confidentially and that its privacy would be preserved.

24. Plaintiff and the Class turned over their Private Information to Defendant reasonably expecting, and on the shared understanding, that Defendant would honor its duty to keep that information confidential and shielded from unauthorized access.

25. Because Defendant collected and retained this Private Information for its own financial gain, it bore an ongoing duty to implement reasonable measures to keep the Private Information of Plaintiff and the Class from reaching third parties.

**B. Defendant's Failure to Prevent, Detect, and Promptly Report the Breach**

26. Defendant admits that an unauthorized third party reached its computer systems. Defendant did not take adequate steps to protect those systems against intrusion.

27. The Private Information that Defendant permitted to be exposed is precisely the kind of data Defendant knew, or should have known, cyberattackers target.

28. Despite knowing the inherent dangers of cyberattacks—and notwithstanding the FTC's published data-security principles—Defendant failed to disclose that its systems and practices were not up to the task of reasonably protecting the Private Information of Plaintiff and the Class.

29. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[1] The guidelines also recommend that businesses use an intrusion detection

[1] *See Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[2]

30. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[3]

31. Defendant was prohibited by the Federal Trade Commission Act (the "FTC Act") (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission (the "FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

32. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

33. Defendant failed to properly implement basic data security practices.

---

[2] *Id.*

[3] *Id.*

34. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to the Private Information it possesses constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

35. Defendant was at all times fully aware of the obligation to protect the Private Information of students and employees of the school districts with which it contracts. Defendant was also aware of the significant repercussions that would result from its failure to do so.

**C. Defendant Knew or Should Have Known a Breach Was Likely**

36. That Private Information is a prized commodity and a routine target of hackers is common knowledge.

37. Defendant's data-security obligations were heightened by the recent surge in cyberattacks and data breaches. Against the backdrop of well-publicized breaches at leading companies—including Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estée Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), Advanced Info Service (8.3 billion records, May 2020), PowerSchool (60 million students/10 million educators, December 2024), and Instructure/Canvas (25 million users, April/May 2026)—Defendant knew, or as a reasonable business should have known, that the Private Information it gathered and stored would be targeted by cybercriminals.

38. In 2024, 3,158 data breaches occurred, exposing roughly 1,350,835,988 sensitive records—a 211% year-over-year increase.

39. Cyberattacks have grown so pervasive that the FBI and the U.S. Secret Service have warned likely targets to recognize the threat and prepare to defend against it.

40. The rise in these attacks, and the attendant risk of more to come, was therefore widely understood by both the public and Defendant.

41. Even so—despite the steady stream of public breach disclosures, and despite its own awareness both of those incidents and of its obligation to keep Private Information secure—Defendant failed to take the steps needed to protect the Private Information of Plaintiff and the Class.

42. This publicly available information confirms that, before the Breach, Defendant knew or should have known that (i) ransomware actors were targeting organizations like Defendant; (ii) those actors pursue such organizations aggressively; (iii) they leak stolen corporate data on dark-web portals; and (iv) their tactics include extortion and threats to publish stolen data.

43. Given the information readily available before the Breach, Defendant knew or should have known that there was a foreseeable risk the Private Information of Plaintiff and the Class could be accessed, exfiltrated, and published through a cyberattack. Data breaches are so common today that the risk of experiencing one was entirely foreseeable to Defendant.

**D. Plaintiff's Experience and Injuries**

44. Plaintiff Beth Denuto is a former employee of the Green Township Board of Education and was originally employed by the District from about 1999 until 2026 when Plaintiff retired after 27 years as an educator. Plaintiff is also a victim of the Breach. Green Township Board of Education is a New Jersey-based public school district that utilizes Defendant Frontline Technologies Group, LLC's services to maintain and manage school district information, including the personal information of its employees such as Plaintiff. Based on Plaintiff's personal knowledge, the District uses various resources offered by

Defendant, including but not limited to resources to assist with Green Township Board of Education's absence management and payroll services.

45. As a condition of employment with the school district, Plaintiff was required to entrust her Private Information to Defendant.

46. Plaintiff did so, trusting that Defendant would protect it with reasonable measures consistent with state and federal law.

47. Defendant's inadequate cybersecurity and data-disposal practices left Plaintiff's Private Information exposed to theft by cybercriminals and sale on the dark web.

48. Plaintiff suffered actual injury from the exposure of this Private Information, which violated Plaintiff's right to privacy.

49. Plaintiff also suffered actual injury in the form of damage to, and the diminished value of, Plaintiff's Private Information—intangible property that Defendant was obligated to safeguard.

50. Since learning of the Data Breach, Plaintiff has been required to spend time and undertake reasonable efforts to limit the fallout, including researching the Breach. In addition, Plaintiff has already experienced misuse of her Private Information resulting in concrete harm. In or around the Summer of 2026, Plaintiff noticed a suspicious charge on her credit card that she did not authorize or recognize. As a result, Plaintiff was forced to spend time reviewing her account statements, disputing the fraudulent charge with her financial institution, canceling the affected card, and awaiting issuance of a replacement. During this period Plaintiff was deprived of access to the funds and account at issue and remains at a continuing, imminent risk of further fraud and identity theft as a direct result of the Data Breach.

51. As a further result of the Data Breach, Plaintiff was forced to enroll in credit monitoring and identity-theft protection services to guard against the imminent and ongoing risk of fraud and identity theft.

52. Plaintiff also began receiving text message solicitations from potential bad actors Around the same time, Plaintiff began noticing an increase in phishing emails. Plaintiff has taken preventative measures by avoiding interactions with and reporting text messages and phishing emails sent from potential bad actors. Upon information and belief, this misuse and the increase in unwanted solicitation are a result of the Data Breach.

53. Plaintiff will be required to continue to devote substantial time and effort to monitoring accounts to guard against identity theft. Plaintiff worries about future financial security and about the uncertainty surrounding what was exposed, and has experienced anxiety, stress, fear, and frustration as a result of the Breach. This is no mere worry or inconvenience; it is exactly the kind of harm the law recognizes for victims of a data breach.

54. As a direct and proximate result of the Data Breach, Plaintiff now faces a present, immediate, ongoing and continuing risk of fraud, identity theft, and misuse flowing from the placement of Plaintiff's Private Information in the hands of unauthorized third parties.

55. Once Private Information is for sale and accessible on the dark web, criminals can exploit it to harvest and steal still more data. Plaintiff's Private Information was compromised in the Breach.

56. Plaintiff retains a continuing interest in ensuring that the Private Information still held by Defendant, on information and belief, is protected against future breaches.

57. Plaintiff likewise retains a continuing interest in lifetime credit- and identity-theft monitoring on account of the Breach.

**E. Plaintiff and the Class Suffered Common Injuries from Defendant's Conduct**

58. Defendant’s failure to adopt or maintain adequate data-security measures directly and proximately injured Plaintiff and the Class by causing the disclosure of their Private Information in the Breach.

59. Because Defendant did not prevent the Breach, Plaintiff and the Class have sustained—and will keep sustaining—damages that include, among other things, monetary losses, lost time, anxiety, and emotional distress. They have also suffered, or face a heightened risk of suffering:

a. Actual identity theft, including fraudulent credit inquiries and cards being opened in their names;

b. Trespass, damage to, and theft of their personal property, including Private Information;

c. Improper disclosure of their Private Information;

d. The imminent and certainly impending injury flowing from actual and potential future fraud and identity theft posed by their Private Information being in the hands of criminals and having already been misused;

e. Damages flowing from Defendant’s untimely and inadequate notification of the Data Breach;

f. Loss of privacy suffered as a result of the Data Breach;

g. Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the Data Breach;

h. Ascertainable losses in the form of deprivation of the value of Plaintiff’s and class members’ personal information for which there is a well-established and quantifiable national and international market;

i. The loss of use of and access to their credit, accounts, and/or funds;

j. Damage to their credit due to fraudulent use of their Private Information; and

k. Increased cost of borrowing, insurance, deposits, and other items which are adversely affected by a reduced credit score.

### F. The Substantial, Ongoing Risk of Identity Theft

60. For years to come, Plaintiff and the Class will face an elevated risk of identity theft because of the Breach.

61. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201 (2013).

62. The FTC defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including a "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id.*

63. The connection between a data breach and the risk of identity theft is straightforward and well documented. Criminals steal personal data in order to monetize it, typically by selling it on the online black market—the dark web—to other criminals, who then use it to carry out an array of identity-theft crimes.

64. The dark web is an unindexed portion of the internet reachable only with specialized software or credentials. Criminals favor it because it affords anonymity to both visitors and site operators. Unlike the ordinary "surface" web, dark-web use requires knowing a site's address in advance—for instance, the CIA's surface-web address is cia.gov, while its dark-web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion. That design keeps dark-web marketplaces largely beyond the reach of authorities and the uninitiated.

65. The unencrypted Private Information of Plaintiff and the Class has been, or will be, offered for sale on the dark web, because that is how hackers operate. Such detailed, unencrypted

data may also reach companies that deploy it for targeted marketing without the consent of Plaintiff and the Class, and unauthorized parties can readily access it.

66. The black-market value of this Private Information is significant. Stolen Private Information trades for years and ranks among the most valuable commodities in the criminal marketplace. According to the credit-monitoring firm Experian, stolen Private Information can fetch as much as $1,000 depending on the type of data, and criminals openly post and sell it on the dark web—compounding the exposure.

67. Victims often take years to uncover identity theft and fraud, giving criminals ample time to sell the Private Information widely.

68. Because a person's identity resembles a puzzle built from many data points, the more accurate pieces a thief assembles, the easier it becomes to impersonate the victim or to mount further attacks that yield still more data.

69. For example, with only a name and date of birth, a thief can use social engineering to extract additional information, such as login credentials or a Social Security number. Social engineering is a technique in which a thief uses already-acquired data to trick individuals into revealing further confidential information—through spam calls, text messages, or phishing emails. Data breaches frequently serve as the launching point for these follow-on attacks.

70. Identity thieves can also use stolen Private Information to obtain a driver's license or official ID bearing the victim's name but the thief's photo; to claim government benefits; to file fraudulent tax returns; to secure employment; to rent housing or obtain medical care in the victim's name; and even to give the victim's identity to police during an arrest, resulting in a warrant issued in the victim's name.

71. One illustration of criminals assembling fragments of stolen data into comprehensive profiles is the "Fullz" package. These profiles are remarkably complete and accurate. Using Fullz, cybercriminals cross-reference stolen Private Information with unregulated data obtained elsewhere—phone numbers, email addresses, mailing addresses, and the like—to build thorough dossiers on individuals.

72. Because of Fullz packages, the Private Information exposed in the Breach can be readily matched with other data about Plaintiff and the Class available online. Even if certain fields—emails, phone numbers, or payment-card numbers—were not among the data stolen in the Breach, criminals can build a Fullz package and resell it, at a premium and repeatedly, to scammers and other bad actors. That is exactly what is occurring here, and any trier of fact, including this Court or a jury, could reasonably conclude that the stolen Private Information of Plaintiff and the Class is being misused and that the misuse is fairly traceable to the Breach.

73. Theft of SSNs also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of the SSN, and a new SSN will not be provided until after the victim has suffered the harm.

74. Due to the highly sensitive nature of SSNs, theft of SSNs in combination with other PII (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. TIME quotes data security researcher Jim Stickley, who is employed by companies to find flaws in their computer systems, as stating, "If I have your name and your Social Security number and you haven't gotten a credit freeze yet, you're easy pickings."[4]

---

[4] Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (Aug. 5, 2019, 3:39 PM), https://time.com/5643643/capital-one-equifax-data-breach-social-security/ (last visited October 7, 2026).

75. There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

76. For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[5]

77. Cybercriminals can post stolen Private Information on the cyber black-market for years following a data breach, thereby making such information publicly available.

78. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, internet-enabled crime reached a record in complaints and dollar losses that year, producing more than $3.5 billion in losses to individual and business victims.

79. The same report notes that "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Yet Defendant did not promptly report to Plaintiff and the Class that their Private Information had been stolen. Defendant's delay in providing proper notice worsened their injuries by depriving them of the earliest chance to protect their Private Information and mitigate the harm.

---

[5] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. SYSTEMICS, CYBERNETICS & INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf (last visited October 7, 2026).

80. Identity-theft victims often endure embarrassment, blackmail, or harassment—online and in person—and suffer financial losses from fraudulently opened accounts or the misuse of existing ones.

81. Beyond out-of-pocket costs that can run into the thousands of dollars, and the emotional toll of identity theft, some victims must spend considerable time undoing the damage. Victims of new-account fraud must correct their credit reports, monitor them for further inaccuracies, close compromised accounts and open new ones, and dispute charges with creditors.

82. Compounding the problem, thieves may wait years before using stolen Private Information. To protect themselves, Plaintiff and the Class will have to remain vigilant for years, if not decades.

**G. Lost Time Mitigating the Risk of Identity Theft and Fraud**

83. Given the recognized danger of identity theft, a person notified that their Private Information has been compromised—as here—is expected to invest time learning about the breach and taking steps to reduce the risk of becoming a victim. Failing to review accounts or credit reports can expose the person to greater financial harm; either way, the person's time is lost.

84. Should Plaintiff and the Class actually experience identity theft or fraud, the harm is well documented. In 2007, the U.S. Government Accountability Office issued a report ("GAO Report") observing that identity-theft victims face "substantial costs and time to repair the damage to their good name and credit record."

85. Because of the actual and imminent risk of identity theft, Plaintiff and the Class must monitor their financial accounts for years to limit the harm.

86. Plaintiff and the Class have already devoted—and will continue to devote—time to prudent protective measures, such as placing freezes and alerts with credit-reporting agencies,

contacting financial institutions, closing or modifying accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports.

87. These efforts track the FTC's recommendations for data-breach victims, which include contacting a credit bureau to place a fraud alert (and considering a seven-year extended alert if identity theft occurs), reviewing credit reports, contacting companies to reverse fraudulent charges, placing a credit freeze, and correcting credit reports.

88. Once Private Information is exposed, there is essentially no way to confirm that it has been fully recovered or shielded against future misuse. Plaintiff and the Class will therefore have to sustain these heightened measures for years—potentially for life—as a consequence of the conduct that caused the Breach.

**H. The Diminished Value of the Private Information**

89. Personal data such as Private Information is a valuable property interest.

90. Its value is self-evident, given the role of "Big Data" in corporate America and the heavy prison sentences imposed for cyber theft. Even this basic risk-reward analysis demonstrates that Private Information carries substantial market value.

91. A legitimate, robust market for personal information also exists. In 2019, the data-brokering industry was worth roughly $200 billion.

92. The data market is so developed that consumers can sell their own non-public information directly to brokers, who aggregate it for marketers and app developers. Consumers who share their web-browsing history with the Nielsen Corporation, for example, can earn up to $60 per year.

93. Because of the Breach, the Private Information of Plaintiff and the Class—which carries inherent value in both legitimate and black markets—has been damaged and diminished by

its unauthorized release, and its likely posting on the dark web, where it holds considerable value for the threat actors.

94. That transfer of value occurred without any consideration paid to Plaintiff or the Class, producing an economic loss. The Private Information is now broadly available, its scarcity has been destroyed, and its value has fallen further.

**I. Future Credit and Identity-Theft Monitoring Is Reasonable and Necessary**

95. To date, Defendant has done little to make Plaintiff and the Class whole for the damages caused by the Breach.

96. Given the targeted and sophisticated nature of the attack, the type of data involved, and the methods cybercriminals use, there is a strong likelihood that entire batches of stolen information have been, or will be, offered for sale on the dark web to criminals intent on identity-theft crimes—opening bank accounts in victims' names to make purchases or launder money, filing false tax returns, taking out loans or insurance, or submitting false unemployment claims.

97. Such fraud may remain hidden until debt-collection calls begin months or years later. A victim may not learn that his or her information was used to claim unemployment benefits until law enforcement notifies the employer of suspected fraud, and fraudulent tax returns are usually discovered only when the victim's genuine return is rejected.

98. The information taken and disseminated in the Breach is far more valuable than, for instance, payment-card data lost in a retail breach, where victims can simply cancel and replace a card.

99. Unlike a payment card, the information disclosed here cannot be "closed," and is difficult—if not impossible—to change.

100. As a result, Plaintiff and the Class face a present and continuing risk of fraud and identity theft for years to come.

101. The retail cost of credit- and identity-theft monitoring can run $200 or more per year per Class Member—a reasonable and necessary expense to guard against the identity-theft risk Defendant's Breach created, and a future cost for at least five years that Plaintiff and the Class would not bear but for Defendant's failure to protect their Private Information.

**J. Lost Benefit of the Bargain**

102. Defendant's deficient data security also deprived Plaintiff and the Class of the benefit of their bargain.

103. In agreeing to provide their Private Information, Plaintiff and the Class understood and expected that part of what they were paying for, or accepting in the form of lower wages, was data security adequate to protect the information Defendant required them to supply.

104. Plaintiff values data security, which is an important consideration in seeking employment.

105. In 2024, the technology and communications company Cisco released the findings of its multi-year "Consumer Privacy Survey," reporting that:

> For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data.[6]

106. Cisco further reported that privacy "has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they

[6] Privacy Awareness: Consumers Taking Charge to Protect Personal Information, CISCO 2024 Consumer Privacy Survey, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last accessed October 7, 2026).

did not protect data properly"; that 89% of consumers "care about data privacy"; and that 83% are "willing to spend time and money to protect data" and "expect to pay more" for privacy.[7]

107. Defendant did not deliver the data security its customers and employees expected. Plaintiff and the Class therefore received services worth less than what they reasonably anticipated under their bargains with Defendant.

**K. Defendant Could Have Prevented the Breach**

108. Data breaches are preventable. As Lucy Thompson explained in the Data Breach and Encryption Handbook, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions." She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised."[8]

109. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures. . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs."[9]

110. In a breach like this one, multiple failures set the stage. The FTC, for instance, has published guidelines establishing reasonable data-security practices for businesses, stressing the need for a data-security plan, routine assessment of risks to computer systems, and safeguards to control those risks.

---

[7] *Id.*

[8] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thomson, ed., 2012).

[9] *Id.*

111. Several additional industry-standard best practices have likewise been identified that businesses like Defendant should, at a minimum, implement.

**L. Defendant Failed to Follow FTC Guidelines**

112. According to the Federal Trade Commission ("FTC"), data security should factor into every business decision. To that end, the FTC has issued numerous guidelines identifying best practices that businesses like Defendant should follow to prevent the unlawful exposure of Private Information.

113. In 2016, the FTC updated Protecting Personal Information: A Guide for Business, setting out fundamental data-security principles. The guidance directs businesses to (i) protect the personal information they retain; (ii) properly dispose of personal information no longer needed; (iii) encrypt information on their networks; (iv) understand their networks' vulnerabilities; and (v) adopt policies to remediate security problems.[10]

114. The guidance also advises businesses to watch for large data transfers out of their systems and to keep a breach-response plan ready.

115. The FTC further recommends that companies retain information no longer than needed to authorize a transaction; limit access to sensitive data; require complex network passwords; use industry-tested security methods; monitor networks for suspicious activity; and confirm that third-party vendors have implemented reasonable security.

116. The FTC has brought enforcement actions against businesses that failed to protect consumer data reasonably, treating the failure to employ reasonable safeguards against unauthorized access to confidential consumer data as an unfair act or practice barred by Section 5

[10] *See Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

of the FTC Act, 15 U.S.C. § 45. The resulting orders further define the measures businesses must take.

117. Defendant's failure to adopt reasonable and appropriate measures against unauthorized access to the Private Information of Plaintiff and the Class is an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

**M. Defendant Failed to Follow Industry Standards**

118. Cybersecurity experts consistently identify data-rich organizations as especially attractive targets, given the value of the Private Information they hold.

119. At a minimum, businesses like Defendant should implement well-established best practices, including: training all employees on cybersecurity; requiring strong passwords; deploying layered defenses such as firewalls, anti-virus, and anti-malware tools; encrypting data; using multi-factor authentication; maintaining data backups; and limiting employee access to sensitive data.

120. Other recognized best practices include: installing malware-detection software; monitoring and restricting network ports; securing web browsers and email systems; configuring network devices such as firewalls, switches, and routers; monitoring and protecting physical-security systems; guarding communication systems; and training staff on key risks.

121. Companies should also retain personal data only as long as necessary and with legal justification, and should not keep it beyond the purpose for which it was collected. Consistent with that standard, Defendant should have promptly deleted any data it no longer needed to serve Plaintiff and the Class.

122. On information and belief, Defendant failed to implement industry-standard cybersecurity measures, including the minimum requirements of both the NIST Cybersecurity

Framework Version 1.1 (among them PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2) and the Center for Internet Security's Critical Security Controls (CIS CSC), all established benchmarks for reasonable cybersecurity readiness.

123. These frameworks are recognized, applicable industry standards. By failing to meet them, Defendant opened the door to the criminals who caused the Breach.

**N. The Harm from the Breach, Now and Going Forward**

124. Data-breach victims are vulnerable to identity theft. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201(9). Once "identity thieves have your personal information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance."[11]

125. The data potentially accessed and compromised here can be used to commit fraud and identity theft.

126. Because their Private Information was compromised in the Breach, Plaintiff and the Class face a substantial risk of identity theft.

127. Stolen Private Information is routinely trafficked on the dark web—a heavily encrypted part of the internet unreachable through ordinary search engines. That encryption lets users and criminals mask their identities and activity, making the dark web difficult for law enforcement to police.

---

[11] *Prevention and Preparedness*, New York State Police, https://troopers.ny.gov/prevention-and-preparedness.

128. When bad actors infiltrate a company and copy and exfiltrate the Private Information it stores, the stolen data often lands on the dark web, where it is bought and sold for profit.

129. For example, when the U.S. Department of Justice announced its 2017 seizure of AlphaBay—the largest online "dark market"—AlphaBay hosted more than 350,000 listings, many for stolen or forged documents usable to assume another's identity. Marketplaces like the now-defunct AlphaBay remain "awash with [PII] belonging to victims from countries all over the world."[12]

130. PII remains highly valuable to criminals, as reflected in dark-web prices. Personal information can sell for $40 to $200, and bank details for $50 to $200. Criminals can even purchase access to entire corporate data breaches for $900 to $4,500.[13]

131. According to the FBI's IC3 2019 Internet Crime Report, internet-enabled crime reached record complaints and dollar losses in 2019, exceeding $3.5 billion in losses to individuals and businesses.[14]

132. The same report stresses that "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Defendant, however, did not promptly report to Plaintiff and the Class that their Private Information had been stolen, delaying notice to the affected individuals well after it learned of the Breach.

---

[12] *Stolen PII & Ramifications*: Identity Theft and Fraud on the Dark Web, ARMOR (April 3, 2018), https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/.
[13] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015) https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.
[14] *2019 Internet Crime Report Released,* FBI (Feb. 11, 2020), https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120

133. As a result of the Breach, the Private Information of Plaintiff and the Class has been exposed to criminals. The injuries they have suffered, or are likely to suffer, as a direct result include: (a) theft of their Private Information; (b) costs of detecting and preventing identity theft; (c) lost time and productivity spent addressing and mitigating the consequences of the Breach; (d) invasion of privacy; (e) the emotional distress, stress, nuisance, and annoyance of responding to the Breach; (f) actual or imminent harm from actual or potential fraud and identity theft caused by placing their data in the hands of criminals; (g) damage to and diminished value of the data they entrusted to Defendant on the shared understanding that it would be safeguarded against theft and unauthorized use; and (h) the continuing risk to their Private Information, which remains with Defendant and is subject to further breaches for as long as Defendant fails to adopt adequate protections.

134. Beyond compensation for economic harm, Plaintiff and the Class have an interest in ensuring that their Private Information is and remains secure and is not subject to further misappropriation.

135. Defendant disregarded the rights of Plaintiff and the Class by (a) intentionally, willfully, recklessly, or negligently failing to adopt adequate and reasonable measures to protect its network servers against intrusion; (b) failing to disclose that it lacked robust security protocols and training; (c) failing to take standard, readily available steps to prevent the Breach; (d) concealing the existence and scope of the Breach for an unreasonable period; and (e) failing to give Plaintiff and the Class prompt and accurate notice of the Breach.

136. The actual and adverse effects on Plaintiff and the Class—including the imminent and continuing heightened risk of identity theft, identity fraud, and medical fraud proximately caused by Defendant's conduct and the resulting Breach—require them to take affirmative

protective steps, including purchasing credit-reporting, credit-monitoring, and internet-monitoring services; frequently obtaining and reviewing credit reports, bank statements, and similar records; placing or lifting credit freezes; and closing or modifying financial accounts, all at financial and temporal cost. Plaintiff and the Class have suffered, and will keep suffering, these damages for the foreseeable future.

## CLASS ACTION ALLEGATIONS

137. Plaintiff brings this action individually and on behalf of the following Class:

> All individuals in the United States who were impacted by the Data Breach, including all individuals who received Notice of the Data Breach (the "Class").

138. Excluded from the Class are Defendant; its officers, directors, agents, trustees, parents, subsidiaries, corporations, trusts, representatives, principals, servants, partners, joint venturers, and controlled entities; its heirs, successors, and assigns; any persons or entities related to or affiliated with Defendant or its officers or directors; the judge assigned to this action; and any member of the judge's immediate family.

139. Plaintiff reserves the right to amend these Class definitions if further investigation or discovery shows that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified.

140. This action satisfies the requirements for class certification—numerosity, commonality, typicality, adequacy, and superiority.

141. **Numerosity, Fed. R. Civ. P. 23(a)(1)**: The Class is so numerous that joinder of all members is impracticable. On information and belief, the Class comprises thousands of members, more than enough to warrant certification.

142. **Commonality, Fed. R. Civ. P. 23(a)(2):** There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information;

b. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d. Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e. Whether Defendant owed a duty to Class Members to safeguard their Private Information;

f. Whether Defendant breached the duty to Class Members to safeguard their Private Information;

g. Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

h. Whether Defendant should have discovered the Data Breach sooner;

i. Whether Plaintiff and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j. Whether Defendant's conduct was negligent;

k. Whether Defendant breached implied contracts with Plaintiff and Class Members;

l. Whether Defendant was unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiff and Class Members;

m. Whether Defendant failed to provide notice of the Data Breach in a timely manner; and

n. Whether Plaintiff and Class Members are entitled to damages, civil penalties, and/or injunctive relief.

143. **Typicality, Fed. R. Civ. P. 23(a)(3)**: Plaintiff's claims are typical of the Class's. Like every other member, Plaintiff had Private Information compromised in the Breach. Plaintiff is a Class Member, the harm Plaintiff suffered mirrors that of the Class, and all of it flowed from the same misconduct by Defendant.

144. **Adequacy of Representation, Fed. R. Civ. P. 23(a)(4):** Plaintiff will fairly and adequately protect the Class's interests. Plaintiff has no interests antagonistic to or in conflict with the Class and has retained counsel experienced in consumer and commercial class-action litigation who will prosecute this action vigorously.

145. **Superiority, Fed. R. Civ. P. 23(b)(3):** A class action is superior to other methods for fairly and efficiently resolving this controversy. Because individual members' damages are relatively small, the cost and burden of individual suits would make it impractical for them to seek redress on their own. Absent class treatment, Defendant would likely continue its conduct, retain improperly obtained revenues, or otherwise escape accountability.

146. **Injunctive Relief, Fed. R. Civ. P. 23(b)(2):** Defendant has acted and/or refused to act on grounds that apply generally to the Class therefore making injunctive and/or declarative relief appropriate with respect to the Class under 23(b)(2).

147. Defendant has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

148. Information about Defendant's policies is available from Defendant's own records.

149. Plaintiff knows of no difficulty in managing this litigation that would prevent its maintenance as a class action.

150. Individual actions by Class Members would risk inconsistent adjudications and incompatible standards of conduct for Defendant. Class treatment will avoid repetitive, inefficient litigation.

151. Finally, all members of the proposed Class are readily ascertainable. UMMC has access to Class Members' names and addresses affected by the Data Breach.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

152. Plaintiff re-alleges and incorporates the foregoing paragraphs as if fully set forth herein.

153. Plaintiff asserts this claim individually and on behalf of the Class.

154. Defendant knowingly collected, received, and maintained the Private Information of Plaintiff and the Class, and so owed a duty to use reasonable care to safeguard and protect that information from being compromised, lost, stolen, misused, or disclosed to unauthorized parties.

155. Defendant owed a duty to maintain procedures capable of detecting and preventing the loss or unauthorized dissemination of that Private Information.

156. Defendant owed, and continues to owe, a duty to timely disclose that the Private Information in its possession was compromised and to specify what types of information were affected.

157. Defendant owed Plaintiff and the Class a duty to provide data security consistent with industry standards and with the applicable standard of care drawn from statutory authority such as Section 5 of the FTC Act, and to ensure that its systems, networks, and responsible personnel adequately protected the Private Information.

158. This duty of care arose from the special relationship between Defendant and Plaintiff and the Class. Defendant was positioned to ensure that its systems were adequate to guard against the foreseeable risk of a data breach.

159. Defendant's duty to protect confidential data arose not only from the statutes and regulations described above but also from the industry standards binding on Defendant.

160. Defendant breached these duties by failing to use reasonable care to safeguard and protect the Private Information of Plaintiff and the Class.

161. Defendant's negligent acts and omissions include, but are not limited to:

a. failing to adopt, implement, and maintain adequate security measures to safeguard the Private Information;

b. failing to adequately monitor the security of its networks and systems; and

c. failing to ensure, on an ongoing basis, that its systems and networks maintained reasonable data-security safeguards.

162. Through these acts and omissions, Defendant unlawfully breached its duty to use reasonable care to protect and safeguard the Private Information of Plaintiff and the Class within Defendant's possession.

163. Through these acts and omissions, Defendant unlawfully breached its duty to maintain appropriate procedures to detect and prevent the dissemination of that Private Information.

164. Through these acts and omissions, Defendant unlawfully breached its duty to timely disclose to Plaintiff and the Class that the Private Information in its possession may have been compromised and to identify the specific information affected.

165. Defendant breached the duties imposed by 15 U.S.C. § 45, the FTC guidelines, the National Institute of Standards and Technology's Framework for Improving Critical Infrastructure Cybersecurity, and other industry guidelines. In violation of 15 U.S.C. § 45, Defendant failed to implement adequate data-security procedures to reasonably protect the Private Information. In violation of the FTC guidelines, among other things, Defendant failed to protect the Private Information it kept; failed to properly dispose of information no longer needed; failed to encrypt information on its networks; lacked an adequate understanding of its networks' vulnerabilities; and failed to adopt policies to correct security problems.

166. It was foreseeable that Defendant's failure to use reasonable measures would injure Plaintiff and the Class, and the breach was reasonably foreseeable given the well-known frequency of cyberattacks and data breaches.

167. It was foreseeable that failing to adequately safeguard the Private Information would cause injury to Plaintiff and the Class.

168. Defendant's breach of its duties caused the Private Information of Plaintiff and the Class to be compromised.

169. But for Defendant's negligence and breach of the duties described above, the Private Information of Plaintiff and the Class would not have been compromised.

170. As a result of Defendant's negligence, Plaintiff and the Class face imminent harm—their Private Information, now in the hands of third parties, will be used for fraud—and have suffered and will suffer damages including a substantially increased likelihood of identity theft; the compromise, publication, and theft of their personal information; lost time and costs associated with preventing, detecting, and recovering from unauthorized use of that information; the

continuing risk to that information; future time, effort, and money required to address the Breach's impact; and overpayment for services or products delivered without adequate data security.

**COUNT II**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiff and the Class)**

171. Plaintiff re-alleges and incorporates the foregoing paragraphs as if fully set forth herein.

172. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," which—as the FTC interprets and enforces it—includes Defendant's unfair practice of failing to use reasonable measures to protect the Private Information of Plaintiff and the Class. Various FTC publications and orders likewise supply the basis of Defendant's duty.

173. Defendant violated Section 5 of the FTC Act (and comparable state statutes) by failing to use reasonable measures to protect the Private Information and by failing to meet industry standards.

174. Defendant's conduct was especially unreasonable given the nature and volume of the Private Information it collected and stored and the foreseeable consequences of a breach of its systems.

175. Class Members are consumers within the class of persons Section 5 of the FTC Act (and comparable state statutes) was designed to protect.

176. The harm here is the type that the FTC Act (and comparable state statutes) was meant to prevent. The FTC has pursued more than fifty enforcement actions against businesses whose failure to employ reasonable data-security measures, and whose unfair and deceptive practices, caused the same harm suffered by Plaintiff and the Class.

177. As a result of Defendant's negligence *per se*, Plaintiff and the Class have been harmed and have sustained damages including, but not limited to, damages from identity theft and fraud; out-of-pocket costs for identity-protection and restoration services; an increased risk of future identity theft and fraud and the associated costs; and time spent monitoring, addressing, and correcting the present and future consequences of the Breach.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

178. Plaintiff re-alleges and incorporates the foregoing paragraphs as if fully set forth herein.

179. Plaintiff and the Class conferred a benefit on Defendant by providing their Private Information.

180. Defendant knew of and appreciated the benefit conferred on it, and further benefited from receiving the Private Information of Plaintiff and the Class.

181. Under principles of equity and good conscience, Defendant should not be allowed to retain the full value of that Private Information, because Defendant failed to adequately protect it. Had Plaintiff and the Class known Defendant would not protect their Private Information, they would not have provided it.

182. Defendant should be required to disgorge, into a common fund for the benefit of Plaintiff and the Class, all unlawful or inequitable proceeds it received as a result of its misconduct and the Breach it caused.

**COUNT IV**
**BREACH OF IMPLIED CONTRACT**

**(On Behalf of Plaintiff and the Class)**

183. Plaintiff re-alleges and incorporates the foregoing paragraphs as if fully set forth herein.

184. Plaintiff and the Class entrusted their Private Information to Defendant as part of Defendant's regular business practices and as a condition of employment.

185. In doing so, Plaintiff and the Class entered into implied contracts under which Defendant agreed—in exchange for the services or employment it provided—to safeguard that information, keep it secure and confidential, and promptly and accurately notify Plaintiff and the Class if the data were breached, compromised, or stolen. Implicit in these exchanges was Defendant's promise to keep the Private Information in its possession secure.

186. Pursuant to these implied contracts, Plaintiff and the Class supplied their Private Information, and Defendant agreed—and Plaintiff and the Class understood—that Defendant would (1) provide services or employment; (2) take reasonable measures to protect the security and confidentiality of the Private Information; and (3) protect the Private Information consistent with federal and state law and industry standards.

187. Implicit in these exchanges was Defendant's promise that the Private Information would be used only for the agreed purposes and that Defendant would take adequate measures to protect it.

188. A material term of each implied contract was Defendant's covenant to use reasonable efforts to safeguard the Private Information. Defendant breached that covenant by allowing the Private Information to be accessed in the Breach.

189. Implicit in the agreement between Defendant and Plaintiff and the Class was the obligation to keep the information confidential and secure.

190. These exchanges reflected an agreement and a meeting of the minds between the parties.

191. When the parties reached their agreement, mutual assent occurred. Plaintiff and the Class would not have disclosed their Private Information but for the prospect of Defendant's services, and Defendant would not have accepted the Private Information had it not intended to provide those services.

192. Defendant was therefore obligated to reasonably safeguard the Private Information of Plaintiff and the Class against unauthorized disclosure and use.

193. Plaintiff and the Class would not have entrusted their Private Information to Defendant absent these implied contracts, and would instead have retained the ability to control it.

194. Defendant breached its implied contracts by failing to reasonably safeguard and protect the Private Information of Plaintiff and the Class.

195. Defendant's failure to adopt adequate protective measures defeated the purpose of the agreement between the parties.

196. As a direct and proximate result of Defendant's breach of its implied contracts, Plaintiff and the Class suffered the damages described above.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a) For an order determining that this action may proceed as a class action and certifying Plaintiff as Class representative and Plaintiff's counsel as Class Counsel;

(b) For a declaration that Defendant's conduct violates the laws cited herein;

(c) For judgment in favor of Plaintiff and the Class on every count asserted;

(d) For damages in amounts to be determined by the Court and/or a jury;

(e) For statutory damages or penalties to the extent available;

(f) For pre-judgment interest on all amounts awarded;

(g) For restitution and all other forms of monetary relief; and

(h) For such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims in this Class Action Complaint so triable.

Dated: October 12, 2026

Respectfully submitted,

Benjamin F. Johns (PA ID 201373)
Samantha E. Holbrook (PA ID 311829)
Deirdre R. Mulligan (PA ID 331264)
**SHUB JOHNS & HOLBROOK LLP**
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428
T: (610) 477-8380
bjohns@shublawyers.com
sholbrook@shublawyers.com
dmulligan@shublawyers.com

*Attorneys for Plaintiff and the Proposed Class*